UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

ROLAND HALL,

           Plaintiff,

     v.

IDAHO DEPARTMENT OF FISH AND
GAME; RICK BOGAR, in his official
and individual capacities; and, ROBERT
SOUMAS, in his official and individual
capacities,

          Defendants.

Case No. 2:11-cv-00622-BLW

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

Before the Court are cross-motions for summary judgment filed by Plaintiff
Roland Hall (Dkt. 15) and Defendant Robert Soumas and Rick Bogar (Dkt. 19). Also
pending before the Court is Plaintiff Hall's motion for leave to amend the Complaint to
add a claim for punitive damages (Dkt. 14), as well Hall's motion to exclude Soumas and
Bogar as expert witnesses (Dkt. 15). The Court heard oral argument on March 21, 2013,
and took the matter under advisement.

This case involves a 42 U.S.C. § 1983 suit arising out of Defendant Robert Soumas' allegedly coercive interrogation and malicious prosecution of Plaintiff Roland Hall.  The Court concludes that Soumas did not deprive Hall of a constitutional right, and Hall has chosen to dismiss the claims against Defendant Rick Bogar. The Court will therefore deny Hall's motion for summary judgment and grant Soumas and Bogar's motion for summary judgment with respect to the § 1983 claims.  The Court will also dismiss Hall's remaining state law claims.  The motion to amend the Complaint to add a claim for punitive damages and the motion to exclude expert witnesses are moot.

## BACKGROUND

 On Saturday, September 5, 2009 – the day before bow season for elk opened – Plaintiff Roland Hall and his friend, Dennis Liermann, went scouting for elk in the Tapper Creek drainage, north of Upper Priest Lake.  *Hall Dep.* 20-21, Ex. A to Dinius Aff., Dkt. 16. Hall scouted the creek while Liermann scouted the ridge. *Id.* at 26:17-25. Later that day Hall received a radio call from Liermann, and Hall went to the ridge to meet him.  *Id.* at 27:15-25.  When Hall arrived on the ridge, he saw that Liermann had killed two bull elk with his bow. *Id.* at 30:12-14.

Two eye witnesses saw Liermann kill the elk and reported the incident to the Idaho Department of Fish and Game. *Soumas Aff.* ¶ 3, Dkt. 19-3. The eye witness recognized Liermann. *Id.* The eye witness also reported that he saw a second man come into view about five minutes after the second elk had been shot.  *Id.* The eye witness did not know the second man.

The Department sent one of its officers, Defendant Robert Soumas, to investigate. *Id.* Soumas contacted Defendant Rick Bogar, another Fish & Game officer, and asked him to assist in the investigation. *Id.* Soumas located Hall's truck, which was parked across the road from where a family was camping. *Id.* ¶ 4.  Members of the family told Soumas that two men had parked there, Hall had introduced himself, and the two men then left on foot.  *Id.* The family only noticed that Hall carried a bow; they did not see Liermann's. *Id.*

Soumas and Bogar decided to wait for the men to return. *Id.* Soumas and Bogar bookended Hall's empty truck with their Fish and Game vehicles – Soumas parked his Fish and Game vehicle a little way past the truck in one direction on the road and Bogar did the same in the other direction.  *Id.* ¶ 5.

When Hall and Liermann returned, they got into their truck and headed toward Soumas' vehicle.  *Id.* ¶ 6. As Hall and Liermann approached, Soumas turned his headlights on low beam and activated his overhead emergency lights. *Id.*  Bogar approached from behind the truck with his headlights on low beam; Bogar did not activate his emergency lights.  *Id.*

Hall stopped his truck, and Soumas parked in front of it, slightly offset. *Id.* ¶ 7. Bogar parked his vehicle behind the truck and to the side so that his headlights would shine at the passenger compartment of the truck. *Id.* The stop occurred on a public road, about 100 yards from the campsite where the family was camping. *Id.* Hall said he felt "boxed in" by the two vehicles.  Both Soumas and Bogar, however, reported that Hall left

first, before Soumas and Bogar moved their vehicles, so apparently Soumas and Bogar left enough clearance on the road that Hall could pass by them.  *Id.* ¶ 8.

After pulling Hall over, Soumas walked toward Hall's truck and observed both Liermann and Hall wore camouflage and had blood on their clothes. *Report of Investigation* at 3, Ex. 1 to Soumas Dep., Dkt. 13-5.  Seeing the camouflage and the blood, Soumas asked Hall and Liermann "if they had been hunting." *Soumas Dep.* 33:23-25.  When they answered yes, Soumas asked them to exit the truck.  *Id.*

Soumas began questioning the two men together.  *Soumas Aff.* ¶ 10; *Bogar Aff.* ¶ 10. He asked them to explain the blood on their clothing, and Liermann said he shot a bear that he had left "way the hell up there." *Report of Investigation* at 3. Soumas then "asked them if we ran DNA testing on their clothing would it come back as bear or elk and told them this was their opportunity to explain what happened." *Report of Investigation*  at 3. Soumas suggested that DNA testing would be expensive. *Soumas Dep.* 44:6-22.  Soumas also asked Hall and Liermann whether they preferred to talk to him on the side of the road "or down at the Bonner County jail." *Id.* at 46:12-15.

"After some discussion and silence, with both men staring at each other, LIERMANN stated: - 'I shot an elk' - 'Just one' - 'Five by six, but it has little stickers on it.'"  *Report of Investigation*  at 3.  Soumas then asked Hall if he shot anything, and he said:  "-'I did' – 'A six by six.'" *Id.* After some more discussion, Soumas asked: "No one shot two," and Hall replied, "No." *Id.*   Soumas asked whether their intent was to take elk early if they saw some, and Liermann said, "No, not really…. Usually the season opens earlier and they're not talking like that, but they were talking today." *Id* at 4.

Soumas had been questioning Hall and Liermann for less than an hour when they confessed to killing the elk.  *Soumas Dep.* 48:15-18; *Soumas Aff.* ¶ 10.

Based on Hall and Liermann's statements that they had each shot an elk, Soumas issued misdemeanor citations to both men.  *Soumas Aff.* ¶ 10. Soumas and Bogar then followed Hall and Liermann to their hunting camp at a warming hut.  *Id.*¶ 11. At the warming hut, Soumas seized Liermann's bloody shirt and Hall's bloody shirt and pants and issued them both receipts.  *Id.* This took about 15 to 20 minutes. *Soumas Dep.* 48:22-23.  Hall and Liermann agreed to meet Soumas the next day after the elk was packed out.  *Id.*

Soumas never read Hall and Liermann their Miranda rights because Soumas did not believe they were in custody.  *Soumas Aff.* ¶ 10. Soumas indicates that he never physically detained Hall or Liermann and never told either that he was under arrest. *Id.* Soumas, however, testified that Hall and Liermann were not free to leave. *Soumas Dep.* 36:13-14. And Hall testified that he felt the road was too narrow for two cars to pass side by side.  *Hall Dep.* 37:15-25.

Bogar did not ask Hall or Liermann any questions. *Bogar Aff.* ¶ 9. Bogar acted only as a "cover officer, to intervene only if Soumas was threatened or in danger," and Bogar never felt Soumas was in danger. *Id.* Nor did Bogar feel that Miranda warnings were necessary because the stop was relatively brief and ended with Hall and Liermann being allowed to leave.  *Id.* ¶ 10.

Only Soumas met with Hall and Liermann the next day. *Id.* ¶ 12. The meeting occurred outside of the warming hut and lasted about 23 minutes. *Id.* Soumas seized the elk meat and antlers. *Id.*

Soumas left but then returned to the warming hut after meeting with the eye witnesses who reported seeing Liermann shoot both elk. *Id.* ¶ 13. Soumas explained that the witness said Liermann had killed both elk. The witnesses seemed "very sure" that Liermann killed both elk and they could even positively identify the green and white fletching on the arrows used by Liermann to kill the elk. *Soumas* Dep. 68:17-25; 69:1-3, 6-9. Both Hall and Liermann insisted, however, that they had each killed one elk. *Id.* Soumas then told Hall and Liermann to return the citations he had issued to them the night before. *Id.* He also seized their bow and arrows. *Id.* Soumas maintains that Hall and Liermann were free to leave at any point during this second meeting. *Id.*

A couple of weeks later, Soumas issued a report dated September 23, 2009. He described the investigated offense as: "Kill/possess two (2) bull elk within a twelve (12) month period with reimbursable assessment of more than one thousand dollars ($1000) 36-1401(c)(3) Felony"; "Take (two) bull elk during closed season 36-1101(a) Misdemeanor"; "Counsel, aid in commission of misdemeanor 18-305 Misdemeanor." The report detailed the events that occurred on September 5 and 6, 2009, including the call from the eye witness who reported seeing Dennis Liermann kill both elk, as well as Hall's statements that he had killed one elk. Soumas' report made clear the eye witnesses had seen Liermann shoot both elk.

On October 5, 2009, Soumas met with one of the eye witnesses, Mack Stevens. Soumas recorded the interview.  During the interview, Stevens confirmed again that Liermann alone had killed both elk.  Stevens also said that he did not see Hall kill or handle the elk in any way, and that when Hall arrived at the kill site, he gave Liermann a look like "what did you do this for." *Audio Interview*, Ex. E to Dinius Aff., Dkt. 13-8. This same audio recording revealed that Soumas had attempted to visit the kill site a couple of weeks after Liermann had killed the elk.  It was raining, and Soumas did not find any evidence at the site, but he was not sure if he was in the right place.

Soumas later denied visiting the kill site during the suppression hearing, and he never gave this recording of the Stevens' interview to the Boundary County prosecutor, Jack Douglas.  Douglas did not learn of the recording and the kill site visit until Soumas produced the recording at his deposition three years later. *Douglas Aff.* ¶¶ 8-9, Dkt. 13-12.

The same day Soumas interviewed Mack Stevens, Soumas signed under oath a criminal complaint against Hall, charging him with unlawfully killing two bull elk within a 12-month period.  Soumas did not draft the complaint.  The Boundary County prosecutor Jack Douglas did. Douglas, however, in his affidavit states: "If I had knowledge of the testimony of CI2 [Stevens], I would not have charged Roland Hall in Boundary County Case CR—2009—1419." *Id.*

On October 6, 2009, Soumas testified at a telephonic probable cause hearing. Soumas referenced Hall's confession of killing one elk but explained that the two eyewitnesses saw Liermann kill both elk.  After Soumas' testified, the judge questioned

how Hall could be charged with killing the same two elk the eyewitnesses saw Liermann

kill. *Probable Cause Hearing Tr.* at 9.  Soumas responded that both Hall and Liermann

were in possession  of the two elk, and "possession means both actual and constructive

possession…"  *Id.* at 9-10.  Apparently accepting Soumas' explanation, the judge found

probable cause to charge both Liermann and Hall:

> COURT: Alright. I'm--obviously the--it--from the testimony they
> were both hunting. We've got, uh, they admit killing the two. They
> say they each killed one, but it--that doesn't sound like that's what--
> what happened. They were take—they were taking--both taking
> steps to conceal and take the meat so I'll go ahead and find probable
> cause to charge each and I'll sign the complaints and summons and I
> will fax them back.

*Id.* at 10.

Right after Hall was charged, on October 15, 2009, the Department of Fish and

Game issued a press release, which discussed the charges against Hall.  The article,

which appeared in the Bonners Ferry Herald, stated that "Two Boundary County men

have been charged with felonies after each killed a bull elk one day before the archery

season opened on September 5." *Oct. 15, 2009 Article,* Dinius Aff., Ex. F. It identified

Hall as one of the two men. And it quoted Soumas as follows:

> These two legitimate sportsmen really helped make this case by
> carefully recording what they witnessed and reporting it right
> away….That gave officers the opportunity for a timely response. By
> unlawfully taking the two bulls before season, Hall and Liermann
> not only cheated their fellow hunters out of the opportunity to legally
> hunt these elk, they also gave a black eye to the whole hunting
> community.

*Id.*

Both Soumas and Bogar maintain that they did not prepare the press release, or aid in its preparation. On February 2, 2010, the Idaho Department of Fish and Game distributed another press release, which again recounted the allegations.  Soumas had input drafting the second release and the opportunity to make changes before it was sent to the media. *Soumas Dep.* 72:7-25; 73:1-5.

About a month after the first complaint and press release were issued, the charges against Hall were amended. The charge was changed to aiding and abetting Dennis Liermann in unlawfully killing two elk in violation of Idaho Code § 36-1049(c)(3). *Soumas Dep.* Ex. 5, Dkt. 13-5. And then a week later, on November 20, 2009, the charge was changed a second time to unlawfully killing *and* possessing two bull elk within a twelve-month period. *Id.* at Ex. 6.

On June 28, 2010, the state district court granted  Hall's motion to suppress all statements Hall made "during the custodial interrogation" on September 5, 2009.  The court found that Soumas's questioning of  Hall on September 5 was a custodial interrogation, and Hall therefore was entitled to a *Miranda* warning. After the court's ruling, the prosecutor amended the charge a third time to aiding and abetting in taking/possessing bull elk during closed season.  *Soumas Dep.*, Ex. 7, Dkt. 13-5. The prosecutor then dismissed all charges against Hall on October 14, 2010, because of insufficient proof of criminal intent.

Hall served his Notice of Tort Claim on the Secretary of State on December 10, 2010.  He filed his Complaint on December 12, 2011, alleging five cause of action: (1) civil rights violations under 42 U.S.C. § 1983 against the Idaho Department of Fish &

Game for alleged defects in the training, supervision, and discipline of employees, and the setting of policy regarding training, supervision, and discipline of employees, and for deliberate indifference; (2) Negligence and Gross Negligence in violating Hall's constitutional rights; (3) Intentional/Negligent Infliction of Emotional Distress; (4) Malicious Prosecution/Malicious Use of Process; and (5) Slander.  Since the filing of the original Complaint, the Court dismissed the Idaho Department of Fish & Game and the civil rights claims against Bogar and Soumas in their official capacities based on lack of jurisdiction.

Bogar and Soumas maintain that neither of them was "'responsible for establishing, promoting and enforcing the policies of the State of Idaho' regarding the training, supervision, or discipline of employees."  They also say that neither of them harbored any malice or criminal intent toward Hall – they did not even know Hall prior to September 5, 2009, and they regarded their contact with him "as routine and uneventful." *Soumas Aff.* ¶18; *Bogar Aff.* ¶ 15.

Hall and Defendants Soumas and Bogar have filed cross-motions for summary judgment.  Hall moves for summary judgment on his § 1983 claims and his malicious prosecution claim. Soumas and Bogar move for summary judgment on all of Hall's claims.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). One of the principal purposes of

summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any material fact-a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir.1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir.1988).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes - does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256–57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

## ANALYSIS

The claims against the Idaho Department of Fish and Game have been dismissed. The Court will therefore not need to consider Hall's first claim against the Department for negligent training and supervision.  In addition, at oral argument Hall conceded that his claims against Bogar should be dismissed. The remaining claims against Soumas are the § 1983 claims, malicious prosecution, intentional/negligent infliction of emotional distress, and slander.

### 1.  Civil Rights Violations under 42 U.S.C. § 1983

In Count II of the Complaint, Hall alleges that Soumas had a duty "not to abridge his constitutionally protected rights and to conduct investigations, searches, seizures, and interviews without violating Plaintiff's rights." *Compl.* ¶ 46.

A plaintiff may bring an action under 42 U.S.C. § 1983 to redress violations of his "rights, privileges, or immunities secured by the Constitution and [federal] laws" by a person or entity, including a municipality, acting under the color of state law. *Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004) (citing 42 U.S.C. § 1983; *Monell v. Dep't of Social Servs.*, 436 U.S 658 (1978)). Section 1983 imposes civil liability on any person who, acting under color of state law, deprives a United States citizen of his federal Constitutional or statutory rights. See *Martinez v. California*, 444 U.S. 277, 284 (1980).

**A.    Soumas Did Not Violate Hall's Fifth and Fourteenth Amendment Rights by Failing to Advise Hall of his *Miranda* Rights.**

Hall first argues that Soumas, by interrogating  Hall without advising him of his Miranda rights, violated Hall's Fifth Amendment right to be free from self-incrimination and his Fourteenth Amendment substantive due process right.

### *(1) Fifth Amendment*

Consistent with the Fifth Amendment's prohibition of self-incrimination, the United States Supreme Court has ruled that suspects may not be subjected to "custodial interrogations" unless they have been informed of their Miranda rights. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (stating that Miranda announced a "constitutional rule"). Police officers, however, are not required to administer Miranda warnings to everyone whom they question. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  Nor must *Miranda* warnings be given simply "because the questioned person is one whom the police suspect." *Id.*  Rather, *Miranda* warnings are required only "where there has been such a restriction on a

person's freedom as to render him 'in custody.'" *California v. Beheler*, 463 U.S. 1121, 1124 (1983)(internal quotation marks and citation omitted).

Whether someone interrogated by the police is "in custody" is a legal question. *U.S. v. Bassignani*, 575 F.3d 879,886 (9th Cir. 2009) (In contrast to the underlying factual determinations, we must decide the legal issue—whether Bassignani was in custody—de novo.).[1] It is also an objective test. *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984).  So the subjective views harbored by either the interrogating officers or the person being questioned make no difference. *Stansbury v. California,* 511 U.S. 318, 323 (1994).

The Ninth Circuit has identified five factors to consider in making the custody determination: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Bassignani*, 575 F.3d at 883 (internal quotation marks and citation omitted). These considerations are not exhaustive. "[O]ther factors may also be pertinent to, and even dispositive of, the ultimate determination whether a person would have believed he could freely walk away from the interrogators." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).

---

[1]  Because Soumas and Bogar were not parties to the criminal proceedings and because their interests in this case are not sufficiently identical to the prosecution's interest in the state criminal case, the Court is not bound by the state court's determination that Soumas and Bogar's interview of Hall the night of September 6, 2009 was a custodial interrogation.

After applying all of these factors to the facts of this case, the Court concludes that Soumas' interrogation of Hall was not custodial. The interview took place on the side of a public road, 100 yards from a campground where a family camped.  Only two officers were present – only one of whom asked questions.  There is no evidence that the two officers surrounded Hall.  They did not display their weapons, raise their weapons, or threaten Hall, other than to suggest that Hall had the option to be questioned at the station, rather than on the road.  Hall was never physically restrained – he was not surrounded by Soumas and Bogar or handcuffed or forced to sit in the back of Department vehicle. Soumas never pressured Hall with the threat of arrest, and he never placed Hall under arrest.  At the close of the approximately hour interview, Hall drove away without hindrance – leaving before Soumas and Bogar moved their vehicles.  All of these factors point toward a non-custodial interrogation.

To be sure, Hall's freedom of movement was restricted.  He stopped his truck because Soumas activated his emergency lights, and felt boxed in by Soumas and Bogar's Department vehicles, and was never told he was free to leave. Similarly, Soumas asked Hall and Lierman whether they preferred to talk to him on the side of the road "or down at the Bonner County jail." *Soumas Depos.* at 46:12-15.  Soumas also testified that, in his view, Hall and Lierman were not free to leave.

Even considering the coercive factors identified above, the Court is persuaded that the overall tenor of the interrogation was not coercive.  "The case books are full of scenarios in which a person is detained by law enforcement officers, is not free to go, but

is not 'in custody' for Miranda purposes." *U.S. v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001). A brief border detention, a routine traffic stop, or a *Terry* stop is not custody. *Id.*

Under the doctrine announced in *Terry v. Ohio,* 392 U.S. 1, 30 (1968), a law enforcement officer may briefly detain a person for investigatory purposes if he or she has a reasonable suspicion supported by articulable facts that criminal activity is afoot. *United States v. Sokolow,* 490 U.S. 1, 7 (1989). A routine *Terry* stop is not "custody" triggering the need for *Miranda* warnings, even though the officer briefly detains the suspect, and the suspect is not free to leave. *See, e.g., Butler,* 249 F.3d at 1098.

 "Typically, [a *Terry* stop] means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" without first issuing a *Miranda* warning. *Berkemer,* 468 U.S. at 439–40. So, even if Hall was not free to leave, as both Soumas and Hall believed, this fact is not crucial to the analysis. Instead, in determining whether a challenged action is reasonable, and, thus, falls within the range of permissible investigatory stops or detentions, a court should engage a two-step inquiry, asking (1) whether the officer's action was justified at its inception; and (2) whether the action taken was reasonably related in scope to the circumstances justifying the interference in the first place. *Terry*, 392 U.S. at 19–20.

Here, Soumas had a reasonable suspicion that criminal activity was afoot. Two eyewitnesses reported seeing a bow hunter they identified as Liermann shoot two elk, and they saw a second man come into view after Liermann shot the second elk. When Soumas went to investigate the report, he came across a truck registered to Hall. Soumas

spoke to a man at a camp across from the parked truck registered to Hall.  The man

reported that he had seen two men exit the truck and these men were bow hunting.

According to the man at the camp, the two men had gone toward Trapper Creek, where

the two elk had been shot with a bow.  Thus, Soumas had "a particularized and objective

basis" for suspecting that the truck belonged to the two men involved in killing the two

elk and for initiating the stop.

Soumas and Bogar also acted appropriately in the course of the stop. When Hall

and Liermann returned to the truck, Soumas approached without his weapon drawn.

Soumas saw that the men were wearing camouflage and had blood on their clothes.

Soumas asked the men to identify themselves and tell him what they were doing.  Given

that it was reasonable to suspect Hall and Liermann of shooting two elk out of season,

Soumas' inquiry was clearly related in scope to the justification for its initiation.

Only the duration of the detention gives the Court pause.  The initial encounter,

including Soumas' interrogation of Hall and Soumas and his issuing the misdemeanor

citations, lasted nearly an hour. After Soumas issued the citations, he returned to the

warming hut with Hall and Liermann so he could collect their bloody clothes.  This took

an additional 20 minutes.

It was a lengthy detention. There is no talismanic time limit, however, which

distinguishes a legitimate *Terry* stop from a de facto arrest. *U.S. v. Sharpe*, 470 U.S. 675,

685 (1985). "[C]ommon sense and ordinary human experience must govern over rigid

criteria." *Id.* Indeed, whether a particular investigatory stop is too long turns on a

consideration of all relevant factors, including "the law enforcement purposes to be

served by the stop as well as the time reasonably needed to effectuate those purposes." *U.S. v. Sharpe*, 470 U.S. 675, 685 (1985). Moreover, a court should ask "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* And, as already discussed, the time of detention cannot be the sole criteria for measuring the intrusiveness of the detention. Other factors, including the force used to detain the individual, the restrictions placed on his personal movement, and the information conveyed to the detainee concerning the reasons for the stop and its impact on his rights, affect the nature and extent of the intrusion and, thus, should factor into the analysis. *Bassignani*, 575 F.3d at 883.

Here, the period of detention was justified.  In responding to the circumstances, Soumas diligently pursued a means of investigation that would confirm or dispel their suspicions. Hall presents no evidence that Soumas' scope of inquiry exceeded the purpose justifying the initial stop. The blood on Hall and Liermann's camouflaged clothes and their evasive responses indicated something was awry and created even more reason for the officers pursing the investigation further.  *U.S. v. Richards*, 500 F.2d 1025, 1029 (9th Cir. 1974). "Thus, where the suspects' own unsatisfactory responses to legitimate [law enforcement] inquiries were the principal cause of the extended detainment, the delay of slightly over an hour was not unreasonable." *Id*

In short, the record clearly belies any contention that Soumas neglected to employ any reasonably available alternative methods that could have significantly shortened his inquiry. The length of the detention arose not because Soumas engaged in dilatory tactics,

but, instead, because his investigative efforts, though reasonable under the circumstances, failed to dispel the suspicion that gave rise to the stop.[2] .

While it is close call, even with the length of the interrogation and construing the facts in favor of Hall, a reasonable person would have believed that he was being detained for investigation only – not placed under arrest.  Therefore, no *Miranda* warning was required and no Fifth Amendment violation occurred to support Hall's § 1983 claim.

Even assuming, however, that Soumas violated Hall's *Miranda* rights on the night of September 5, 2009, his claim under the Fifth Amendment would be barred by the statute of limitations.  For § 1983 actions, federal courts apply the state statute of limitations for personal injuries, which is two years under Idaho law.

Federal law, on the other hand, governs the date of accrual for a § 1983 claim. A § 1983 claim accrues at the moment the alleged constitutional violation occurs. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). In *Wallace*, the Supreme Court held that a plaintiff bringing claims for false arrest and false imprisonment had a complete and present cause of action when the false imprisonment ended, which occurred when the plaintiff was arraigned and the legal process began – and not when the plaintiff was released from custody and the charges against him were dropped.  *Id.*

---

[2] Indeed, the Ninth Circuit has found longer durations were non-custodial.  For example, in *Crawford*, the defendant was questioned for more than an hour at an FBI office, and the Circuit found that the interrogation was non-custodial. 372 F.3d 1048,1052 (9th Cir. 2004).  Similarly, in *Bassignani*, the Circuit found a two-and-half-hour interrogation was "at the high end" but nonetheless concluded that the interrogation was non-custodial. 575 F.3d at 886. See also *Haswood*, 350 F.3d 1024, 1028 (9th Cir. 2004) ("Even if we assume that the interrogation lasted all day, ... coercion typically involves far more outrageous conduct."). None of these case involved a *Terry* stop, however, so their usefulness is limited.

Hall complains that Soumas violated his Fifth Amendment right against self-incrimination by interrogating him without first advising him of his *Miranda* rights. *Miranda* warnings are prophylactic only; they are not constitutional rights in themselves. *Oregon v. Elstad*, 470 U.S. 298, 305 (1985). "[V]iolations of judicially crafted prophylactic rules do not violate the constitutional rights of any person." *Chavez v. Martinez,* 538 U.S. 760, 772 (2003). A bare *Miranda* violation, therefore, does not violate the Constitution.  *Id.* at 767. So Soumas' contention that Hall's Fifth Amendment claim arose "from the moment questioning continued after Miranda rights ***should*** have been read to him" is incorrect.

A *Miranda* violation only ripens into a constitutional injury when the compelled statements are "used" in a criminal case against the witness.  *Chavez*, 538 U.S. at 767.  In *Chavez,* the Supreme Court in a plurality opinion expressed that a criminal case "at the very least requires the initiation of legal proceedings." *Id.* The Supreme Court held that the Fifth Amendment was not violated in *Chavez* because the defendant, although perhaps questioned improperly, was never prosecuted for a crime. *Id.* at 767.

In *Stoot v. City of Everett*, the Ninth Circuit examined the meaning of "use" announced by *Chavez*. 582 F.3d 910, 925 (9th Cir. 2009). In *Stoot*, Paul, a twelve year old boy, was questioned coercively and eventually admitted to sexually assaulting a four-year old girl. Criminal charges were filed against Paul on the basis of the confession, but the charges were later dismissed.  Paul's parents brought a § 1983 claim for a Fifth Amendment violation.  Reversing the district court, the Ninth Circuit held that a coerced statement has been "used" in a criminal case "when it has been relied upon to file formal

charges against the declarant, to determine judicially that the prosecution may proceed, and to determine pretrial custody status." *Id.* at 925.

In this case, Soumas referenced Hall's confession to killing one elk when Soumas testified during a probable cause hearing in October 2009, to obtain a felony criminal complaint against Hall.  It is debatable whether the magistrate judge relied on Hall's confession to issue the criminal complaint given the judge's suggestion that he did not believe that Hall had killed one elk despite what Hall had said; instead, the judge found both Hall and Liermann were "taking steps to conceal and take the meat so I'll go ahead and find probable cause to charge each."  *Probable Cause Hearing Tr.* at 10.  But assuming the judge relied on Hall's confession to issue the criminal complaint, Hall's statement was "used" in a criminal proceeding at that time.  Only then did the alleged *Miranda* violation ripen into a constitutional injury.

Hall's Fifth Amendment claim therefore accrued in October 2009, when his confession was "used" in a criminal proceeding. Hall did not file this action until December 12, 2011 – two months after the two-year statute of limitations ran. Thus, his Fifth Amendment claim is barred by the statute of limitations.

Hall, however, says that his Fifth Amendment claim did not accrue until the charges were dismissed against him.  Hall attempts to distinguish *Wallace* on the grounds that *Wallace* only involved one claim for false arrest while this case involves multiple claims, including claims for due process violations and malicious prosecution – both of which are based, in part, on the alleged *Miranda* violation.

Hall is correct that the statute of limitations did not begin to run on his malicious prosecution claim until the charges against him were dismissed.  In *Heck v. Humphrey*, the Supreme Court held that § 1983 plaintiff may not bring a claim that implies the invalidity of the criminal conviction unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. 512 U.S. 477, 486-77 (1994).  But, in *Wallace*, the Court declined to extend *Heck* to "an action which would impugn *an anticipated future conviction*." *Wallace*, 549 U.S. at 39 (emphasis in original). According to the Court, the "impracticality of such a rule should be obvious." *Id*.  In a false arrest case, it would require the plaintiff "to speculate about whether a prosecution will be brought, whether it will result in conviction, and whether the pending civil action will impugn that verdict… all this at a time when it can hardly be known what evidence the prosecution has in its possession."  *Id*.

A Fifth Amendment claim based on an alleged *Miranda* violation more closely resembles a false arrest claim than a malicious prosecution claim.  As already discussed, the Ninth Circuit says that a compelled statement is "used" in a criminal case as soon as it "has been relied upon to file formal charges against the declarant." *Stoot*, 582 F.3d at 925. Thus, as in this case, a plaintiff may have a Fifth Amendment claim based on a *Miranda* violation even if the plaintiff is never prosecuted.  On the flip side, one could have a successful *Miranda* claim and still have a perfectly valid conviction.  Like the plaintiff in *Wallace*, Hall is asking the Court to adopt a principle "that goes well beyond *Heck*: that an action which would impugn *an anticipated future conviction* cannot be brought until that conviction occurs and is set aside." *Wallace*, 549 U.S. at 393 (emphasis

in the original).  The Supreme Court has refused to embrace "this bizarre extension of *Heck*." *Id.*

Hall also argues that the statute of limitations could not have begun to run while the criminal case was pending because he was not allowed to maintain two causes of action simultaneously.  The Supreme Court addressed this issue in *Wallace*.  It said that the district court could stay the federal action until the state criminal proceeding is concluded.  *Wallace*, 549 U.S. at 394.  The Court also said that the statute of limitations period is not automatically tolled if a conviction is obtained and the *Heck* bar goes into effect. *Id.* Tolling is a matter of state law. *Id.* 394-95.  And Hall has provided no Idaho case law to back up his suggestion that the limitations period on his Fifth Amendment claim is tolled until the end of the criminal proceeding.

### (2) Substantive Due Process

Hall argues that Soumas' conduct in eliciting the false confession also violated his Fourteenth Amendment substantive due process rights. Fourteenth Amendment substantive due process rights are violated when police misconduct in pursuit of incriminating statements "shocks the conscience." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 431 (9th Cir.2010).

An interrogation which shocks the conscience typically involve physical or psychological abuse.  An illustration of a potentially conscience-shocking interrogation occurred in *Cooper v. Dupnik*, 963 F.2d 1220, 1223 (9th Cir.1992).  In *Cooper*, the Ninth Circuit held that police violated a suspect's substantive due process rights when they "ignored Cooper's repeated requests to speak with an attorney, deliberately infringed on

his Constitutional right to remain silent, and relentlessly interrogated him in an attempt to extract a confession." *Id.*

Even assuming, for the sake of argument, that Soumas violated Hall's *Miranda* rights, nothing about his conduct "shocks the conscience."  Hall provides no evidence of physical or psychological abuse.  Unlike the officers in *Cooper*, Soumas did not lock Hall in a room, with a plan to isolate the suspect from the outside world, cut him off from his attorney, lie to him, and subject him to other interrogation techniques designed to instill stress, hopelessness, and fear, and to break his resistance.  Instead Soumas asked Hall some questions for less than an hour while standing on the side of a road.  The worst thing Soumas did was give Hall the option to be questioned at the police station and tell him that his bloody clothes could be tested to determine whether the blood was bear blood, as Hall professed, or really elk blood. Nothing about these facts "shocks the conscience."

Also, like Hall's Fifth Amendment claim discussed above, Hall's substantive due process claim based on the alleged *Miranda* violation is barred by the statute of limitations.  A substantive due process case based on a forced confession accrues as soon the law enforcement official obtains the confession through physical or psychological coercion.  Physical or psychological abuse is immediately felt and thus is immediately actionable even if the prosecutor never uses the confession in the criminal case.  *C.f. Cooper v. Dupink*, 963 F.2d 1220, 1237 (9th Cir. 1992) ("The Task Force's wrongdoing was complete at the moment it forced Cooper to speak.").  Thus, Hall's substantive due process claim based on the allegedly coerced confession accrued on the date it was

obtained – September 5, 2009.  Hall's Complaint was filed in December 2011 – more than two years later after the claim accrued.  And Hall has furnished nothing to support any assertion that his substantive due process claim was tolled until after the criminal complaint was dismissed.

### B.  Soumas Did Not Violate Hall's Due Process Rights By Charging Him Without Probable Cause.

Hall next argues that Soumas violated his constitutional rights by causing the prosecutor to charge him without probable cause for killing two elk within a 12-month period.

As already noted, Hall concedes that Bogar had little to do with Hall being charged and agreed to dismiss all claims against Bogar. The claim against Soumas is more complicated, however. Soumas knew of the eyewitnesses' testimony that only Liermann shot the two bull elk. Yet, even with this knowledge, Soumas signed under oath a criminal complaint charging Hall with killing two bull elk within a two-month period.  This troubles the Court.

That said, Soumas did not hide the eyewitness testimony from the prosecutor, who ultimately made the decision to charge Hall for killing two elk.  Soumas' report, which the prosecutor reviewed before charging Hall, contained a detailed description of his first conversation with the eyewitnesses who acted as confidential informants .  And Hall's recounting in his report of the confidential informant interview made very clear that the witnesses had seen Liermann kill both elk. The report conveyed the witnesses' certainty on this point.

Nor did Soumas hide this information from the magistrate judge, who found probable cause existed for the charge.  To maintain a false arrest claim for judicial deception, a plaintiff must show that the officer who executed an arrest warrant or criminal complaint "deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *KRL v. Moore,* 384 F.3d 1105, 1117 (9th Cir. 2004).  Here, the evidence shows that Soumas recounted the most salient facts accurately.  At the very outset of the hearing, Soumas testified that two eyewitnesses, whom Soumas identified as CI1 and CI2, had seen Dennis Liermann kill both elk, and about five minutes after Liermann killed the second elk, another man fitting Hall's description came into view.  *Probable Cause Hearing Tr.* at 2-3, Ex. B to Second Adams Aff., Dkt. 24-1.  Soumas also testified that he talked to the CI2, or Mac Stevens, a second time, and the confidential informant reiterated that he had seen Liermann kill both elk. *Id.* at 8.

In fact, when confronted with Soumas testimony regarding the eyewitness accounts, the magistrate judge asked Soumas how Hall could be charged with killing the same two elk that eyewitnesses had seen Liermann kill. *Id.* at 9.  Hall responded, "Well, your Honor, they were both in, uh, they were both in possession of the elk. And in the definition of take, under 36-202, take means hunts, pursue, catch, capture, shoot, fish, seine, trap, kill or possess or any attempt to do so. And, uh, also possession means both actual and constructive possession ....." *Id.* at 9-10.  This testimony demonstrates that Soumas believed Hall was guilty of a felony for "taking" or "possessing" two elk, not killing them, and he so informed the magistrate judge.  This completely undercuts Hall's

argument that Soumas deliberately or recklessly lied under oath in an attempt to have Hall falsely charged for killing two bull elk.

Hall argues that the magistrate would not have signed off on the criminal complaint if Soumas had disclosed the second confidential informant's statements that Hall seemed upset or disappointed when he realized Liermann had killed the two elk, that Hall might not have been part of the decision to poach the elk, and Stevens did not think Hall had done anything illegal.

Yet even if Soumas intentionally omitted this information, as Hall contends, Soumas' corrected report and testimony would still have contained a core set of facts sufficient to establish probable cause to issue the criminal complaint against Hall under section 36-1401(c)(3), Idaho Code.  Soumas' corrected report would have still contained Hall's confession to killing one elk, which had not yet been suppressed.  And Soumas' corrected report would still have recounted the details regarding Hall's bloody clothes. The blood on Hall's clothes suggested that he had helped butcher both elk, and it is not a great leap to assume that Hall would have used his elk tag to take one of the elk Liermann shot if they not been caught first.

Soumas only omitted Steven's subjective impressions and personal beliefs regarding Hall's guilt. The objective facts linking Hall to possessing the two elk  – Hall's confession and his bloody clothes –were sufficient to overcome any negative inferences the magistrate might have drawn from Steven's subjective impressions of Hall's demeanor.

It should also be noted that the criminal complaint was almost immediately amended to allege, first, aiding and abetting, and, next, killing and possessing two elk. Probable cause existed for both these charges based on Soumas' observations that Hall's clothes were covered in blood, suggesting that Hall had aided Liermann and also suggesting that Hall had "possessed" the elk.

In reality, Hall's problems largely stem from his own misstatements to Soumas. Hall not only told Soumas that he had killed one elk on the night he was interviewed on the side of the road, but also the next day when Soumas interviewed them for a second time. This second interview occurred during the day, outside the warming hut where Hall and Liermann set up their hunt camp, with both Liermann and Hall and only Soumas present – hardly a coercive environment.  Soumas even went back after speaking with the eyewitnesses and asked Hall to clarify his story, but Hall insisted he had killed one elk. The Court can only surmise that Hall assisted in butchering the elks and said he killed one himself in an attempt to aid his hunting companion, but Hall's own conduct exposed him to criminal liability.

### C.    Hall's *Brady* Claim Must Be Dismissed.

Hall's next § 1983 claim alleges that Soumas violated his constitutional rights by failing to disclose exculpatory evidence –  in violation *of Brady v. Maryland*, 373 U.S. 83 (1963).

*Brady* requires both prosecutors and police investigators to disclose exculpatory evidence to criminal defendants. *See Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1087 (9th Cir.2009). The elements of a valid *Brady* claim are: (1) the

prosecution must suppress or withhold evidence, (2) which is favorable, and (3) its nondisclosure prejudiced the plaintiff.  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). With respect to the prejudice prong, the Supreme Court has stated that "strictly speaking, there is never a real ' *Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281.

Here, Hall contends that Soumas should have disclosed the recording of his second interview with the second confidential informant, Mac Stevens.  Hall also says that Soumas should have disclosed that he attempted to visit the kill site and found no evidence.

The Court finds that Hall's *Brady* claim must be dismissed because he cannot satisfy the prejudice prong.  In *Smith v. Almada*, the Ninth Circuit suggested it would join the Tenth, Eleventh, and Sixth Circuits in holding that a plaintiff who has never suffered a conviction cannot maintain a *Brady* claim.  *Smith v. Almada*, 640 F.3d 931, 941 (9th Cir. 2011).  While the *Smith* court declined to decide this issue, Judge Gwin, a member of the three-judge panel, explained in detail why a criminal defendant who is acquitted should not be able to pursue a *Brady* claim: "In sum, allowing *Brady*-based § 1983 claims without a conviction is not compelled by our circuit's case law, conflicts with other circuits' case law and the central purpose of *Brady*, would render *Brady*'s materiality standard significantly less workable, and lacks a limiting principle."  *Id.* at 941–45. Judge Gould, in his own concurrence, provided that he was personally inclined to follow Judge Gwin and other Circuits that had addressed this particular question, but declined to decide

the issue. *Id.* at 940–41. Finally, Judge Nelson dissented and strongly disagreed with

Judge Gwin's position that a conviction should be a prerequisite to a Brady claim under

§ 1983. Id. at 945–48.

 Not long after *Smith* was decided, the Ninth Circuit addressed this issue again in

the unpublished decision, *Puccetti v. Spencer*, and adopted Judge Gwin and Judge

Gould's position:

> The district court correctly reasoned that because the plaintiffs'
> criminal charges were dismissed, the plaintiffs cannot show that any
> suppressed evidence could have produced a different result at trial.
> **Our sister circuits have adopted identical reasoning in denying**
> ***Brady* claims when the plaintiff was never convicted**. *See Morgan
> v. Gertz*, 166 F.3d 1307, 1310 (10th Cir.1999); *Flores v. Satz*, 137
> F.3d 1275, 1278 (11th Cir. 1998); *McCune v. City of Grand Rapids*,
> 842 F.2d 903, 907 (6th Cir.1988). We find this reasoning persuasive
> and affirm the district court's dismissal of plaintiffs' *Brady* claim.

476 Fed.Appx. 658, 660-661, 2011 WL 6292200, 1 (9th Cir. 2011) (emphasis added).

 Because this Court must follow the Ninth Circuit law, and it appears that the

Circuit would likely require a conviction to support a *Brady* claim, the Court will dismiss

Hall's *Brady* claim because the charges against him were dismissed before trial.  This

conclusion coincides with all other courts to face this issue: when all charges have been

dismissed against a defendant before trial, "courts have held universally that the right to a

fair trial is not implicated and, therefore, no cause of action exists under § 1983."

*Morgan*, 166 F.3d at 1310.

## 2.  Malicious Prosecution

 Hall's final § 1983 claim is that Soumas' failure to disclose material information

to the prosecutor caused Hall's malicious prosecution.

To maintain a § 1983 action for malicious prosecution, a plaintiff must show that "the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her [a] specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir.1995). "Probable cause is an absolute defense to malicious prosecution." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009). "Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy v. City of Adelanto,* 368 F.3d 1062, 1067 (9th Cir. 2004). But simply because the Boundary County District Attorney's office – and not Soumas – prosecuted Hall does not automatically shield Soumas from liability.

Here, Hall argues that concealed exculpatory evidence which resulted in Hall being charged with killing two elk in a 12-month period. Specifically, Hall contends that Soumas should have disclosed the recording of his conversation with the second confidential informant, Mac Stevens, as well as the fact that Soumas attempted to visit the kill site but found no evidence. As explained above, however, even after correcting for the information Soumas omitted from his testimony, probable cause supported Hall's prosecution. Because probable cause is an absolute defense to malicious prosecution, the Court will grant summary judgment for Soumas on Hall's malicious prosecution claim. *Smith*, 640 F.3d at 941. For this same reason, the Court will also dismiss Hall's state law claim for malicious prosecution.

### 3.  Remaining State Law Claims

Hall's two remaining state law claims allege intentional/negligent infliction of emotional distress and defamation/slander.  Soumas maintains both claims should be dismissed because Hall failed to serve his Notice of Tort Claim within 180 days after these state law claims arose or reasonably should have been discovered.

The Idaho Torts Claim Act requires that a notice of tort be served within 180 days after the cause of action arose or reasonably should have been discovered. I.C.§ 6-905. Soumas's last act, as described in the Complaint, was his testimony at the hearing on the motion to suppress on June 8, 2010.  *Compl.* ¶ 27.  Hall served his Notice of Tort Claim on December 10, 2010 – 185 days later.  Because Hall failed to serve his Notice of Tort Claim within the 180-day period, his remaining state law claims for defamation and intentional/negligent infliction of emotional distress must be dismissed.

Hall argues that defamation is a continuing violation.  He says, "As late as February 11, 2013, the press release containing an inaccurate, untrue, and incomplete account of the events at hand is still present and active on the Idaho Department of Fish and Game's media website." *Pl.'s Resp.* at 5, Dkt. 26. Even if true, this argument cannot save Hall's slander claim.  Hall cites no case law to support this argument.  Indeed, Hall's argument appears to run counter to the prevailing law on this issue.

In a libel action, the statute of limitations begins to run when the statement is published.  *C.f., Hoglan v. First Sec. Bank of Idaho, N.A.*, 819 P.2d 100, 103 (Idaho 1991). Publication occurs when the defendant communicates the defamatory statement to a third person. *Id.* ("First Security first furnished the information to TRW in November of 1983.").  For articles posted on the internet, publication occurs the day the article is

posted and the statute of limitations begins to run. *Cornelius v. Deluca*, 709 F.Supp.2d 1003, 1014 (D.Idaho April 26, 2010) (applying Missouri law).

For aggregate communications, such as an edition of a newspaper or a book, there is only one single publication. *Oja v. U.S. Army Corps of Engineers*, 440 F.3d 1122, 1130 (9th Cir. 2006)(quoting Restatement (Second) of Torts § 577A(3) (1977)).  This single-publication rules only allows one cause of action for the same publication – even if millions of copies are distributed – and only one statute-of-limitations period that runs from the date when the publication occurred.  *Id.*  Most state and federal courts have concluded that internet publications should be treated the same as traditional media.  *Id.* This means an article posted on a website is published only once – on the day it posted. The fact an article remains on a website indefinitely does not create a continuing violation.  Nor is the article "republished" each day the article remains on the website. *Id.*

The Court agrees with this majority rule, and therefore finds that Hall's defamation action based on the allegedly defamatory press release accrued – and the 180-day period for filing a Notice of Tort Claim began to run – on the day it was posted on the Fish and Game website.  There is no continuing violation or republication of the press release for each day it remains on the website.

Hall's next argument – that his Notice of Tort Claim was not untimely because Hall's prosecution continued after June 8, 2010 "at the insistence and pressure" of Soumas – also fails.  First, Hall's prosecution did not give rise to a defamation claim, so this argument does nothing to help his defamation claim.  And with respect to the

intentional infliction of emotional distress claim, the Court has found that the prosecutor had probable cause to charge Hall; therefore his continuing prosecution was not so extreme and outrageous to give rise to an intentional infliction of emotional distress claim.

## ORDER

IT IS ORDERED THAT:

1.      Plaintiff's Motion for Summary Judgment (Dkt. 13) is DENIED.

2.      Defendant's Motion for  Summary Judgment  (Dkt.  19) is GRANTED.

3.      Defendant's Motion to Strike (Dkt. 22) is MOOT.

4.      Plaintiff's Motion for Leave to File an Amended Complaint to Include Claim for Punitive Damages (Dkt. 14) is MOOT.

DATED: June 6, 2013

B. Lynn Winmill
Chief Judge
United States District Court